**R. H. MACY & CO., Inc., v. COLORADO CLOTHING MFG. CO.**

No. 771.

Circuit Court of Appeals, Tenth Circuit.
Jan. 8, 1934.

Rehearing Denied Feb. 21, 1934.

Edward S. Rogers, of Chicago, Ill. (William T. Woodson, of Chicago, Ill., and Elmer L. Brock, of Denver, Colo., on the brief), for appellant.

Cass M. Herrington, of Denver, Colo. (Cass E. Herrington and Simon J. Heller, both of Denver, Colo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

R. H. Macy & Co., Inc., brought this suit to restrain infringement of the trade-mark MACY'S and to enjoin the Colorado Clothing Manufacturing Company from using such name or any colorable imitation thereof in connection with its business, and for an accounting.

The Macy Company, founded in 1858 by R. H. Macy, is one of the leading department stores in New York City, doing a business of approximately $100,000,000 a year. It expends $2,350,000 annually in advertising in newspapers and magazines having a nation-

wide circulation, and in direct mail advertising. For a time it sent out catalogues and developed a substantial mail-order business. It ceased sending out catalogues in 1910, but still does a large mail-order business. It receives from four to ten thousand letters daily, and ships merchandise to all parts of the United States. During January, February, and March, and from July to November, inclusive, 1930, it made 428 shipments of merchandise into Colorado. Customers from all parts of the United States shop at its store while in New York City. It also owns or is interested in stores in Toledo, Atlanta, and Newark, which are conducted under other names, and one at Palm Beach which is conducted under its own name.

The Macy Company handles men's and boys' clothing, and its annual sales thereof exceed $5,000,000. In 1910 it registered the name MACY'S in the U. S. Patent Office to be used on men's and boys' coats, vests, trousers, and other articles sold by it. The trademark was renewed in 1930 for a period of 20 years.

The Colorado Clothing Company, which was organized in 1924, owned and operated a men's clothing manufacturing plant in Denver. It put out lines of clothing under various names. In 1929 it commenced manufacturing men's suits and overcoats under the name, "Macy Tailoring System of America." Its business had been limited to states west of the Mississippi river. It entered into contracts with local persons in small towns, usually tailors, or cleaners and dyers, whereby such persons became the exclusive authorized dealers for the Colorado Company's line of clothing. Boxes of samples were furnished them. The dealer took the purchaser's measure and sent the order to the Colorado Company. The suit was then made up and returned to the dealer on consignment. The Colorado Company spent about $45,000 for advertising under the name, "Macy Tailoring System of America," and built up a business of about 200 suits a week.

Circular letters were sent out to prospective purchasers, whose names were furnished the Colorado Company by the authorized dealers. These letters were headed:

"One Price            Chain System
"Macy Tailoring System of America
        "Denver, Colorado."

They were signed, "Macy Tailoring System of America." Other advertising of the Colorado Company contained the following: "A Macy Suit is a Beautiful Suit," and "A Macy Overcoat is a Masterpiece." A display card used was as follows:

"Macy
Tailoring System of America
        "One Price
"Suit or
Overcoat $24.75        No more
                       No less
"A Real $50.00 value."

A small label with the name, "Macy Tailoring System of America," was also used to identify its goods, and this was placed on the inside of the inside pocket of the suits and overcoats. After the Macy Company had notified the Colorado Company to cease using such name, the latter added to all its advertising, display cards and labels, in very fine print, the words, "Not connected with R. H. Macy & Co. of New York."

Officials of leading mercantile establishments in New York, Chicago, St. Louis, Kansas City, Omaha, and Denver testified with respect to the business, reputation, and popularity of the Macy Company throughout the United States. They also testified that the Colorado Company's advertising was confusing and misleading.

Michael Heller, president of the Colorado Company, admitted that he knew of the Macy Company at the time his company adopted the name MACY. He testified that according to Jewish custom sons are named after their nearest dead relative; that accordingly he named his son Mashe Eliezer Heller; that Mashe in English means Moses, and that the nearest English word to Mashe is Macy; hence he called his son Macy Elliott and adopted the name MACY as a mark for his clothing from his son's given name.

The trial court found that there was no unfair competition for the reason that it was not shown that the name MACY had acquired a secondary meaning in any territory in which the Colorado Company operated.

■ After this suit was commenced, the Colorado Company ceased doing business under the name, "Macy Tailoring System of America." However, when the suit was filed, the Colorado Company was using the name, and if there was a sufficient showing of unfair competition the Macy Company was entitled to have a decree with costs. Oxford University v. Wilmore-Andrews Pub. Co. (C. C.) 101 F. 443.

In Standard Oil Co. of New Mex. v. Standard Oil Co. of Calif. (C. C. A. 10) 56 F.(2d) 973, 976, this court said:

"One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."

Furthermore, the Colorado Company at the trial claimed the right to continue the use of the name.

It is a question of fact in each case whether or not the goods or business of the subsequent trader is sufficiently distinguished as to prevent any actual or probable confusion and deception. Distinguishing features, which are not so placed or used as to be sufficiently prominent to prevent deception, or which are not likely to attract attention, are insufficient. An artifice, such as the use of small print to make inconspicuous the alleged distinguishing features, shows a purpose to effect unfair competition. It is the usual artifice of the unfair trader. Collinsplatt v. Finlayson (C. C. N. Y.) 88 F. 693; Kyle v. Perfection Mattress Co., 127 Ala. 39, 28 So. 545, 50 L. R. A. 628, 85 Am. St. Rep. 78.

Several witnesses testified that they would have been misled, unless they had examined the circulars and labels closely. The language added in fine print, in our opinion, was not sufficient to distinguish, and was not intended to distinguish the two companies and their articles of merchandise. See Schmitt v. Lamb (D. C. Miss.) 43 F. (2d) 770; G. & C. Merriam Co. v. Ogilvie (C. C. A. 1) 159 F. 638, 16 L. R. A. 549, 14 Ann. Cas. 796. The use of the name by the Colorado Company would be likely to confuse and deceive a purchaser of ordinary prudence. Common honesty requires that the Colorado Company so plainly and unequivocally mark its goods as to preclude such deception, and to require it so to do cannot injure it. Ludlow Valve Mfg. Co. v. Pittsburgh Mfg. Co. (C. C. A. 3) 166 F. 26, 31.

Words or names which have a primary meaning of their own, such as words descriptive of the goods, the place where they are made, or the maker, may by long use in connection with the goods or business of a particular trader come to be understood by the public as designating the goods or business of that particular trader. Such words have a primary and secondary meaning. When a word acquires a secondary meaning, a property right arises which entitles the owner to protection. An appropriation of that name by another in a similar business would directly affect such business, or an expectancy of future business. Standard Oil Co. of New Mex. v. Standard Oil Co. of Calif., supra. Furthermore it identifies such business, and the use of the same name by another might lead to confusion and deception. Standard Oil Co. of New Mex. v. Standard Oil Co. of Calif., supra; R. H. Macy & Co. v. Macys, Inc., (D. C. Okl.) 39 F. (2d) 186; Yale Electric Corp. v. Robertson (C. C. A. 2) 26 F. (2d) 972.

Had the word MACY acquired a secondary meaning in the territory where the Colorado Company was doing business? The evidence shows that the Macy Company has carried on each year a large national advertising campaign; that its customers both at its store and through the mail included persons from all parts of the United States; that it has shipped a large number of mail orders into Colorado and other states west of the Mississippi river; and that it enjoys an enviable reputation.

We cannot escape the conclusion that to the Macy Company's customers in the states west of the Mississippi river the name has come to have a secondary meaning. If such be true, the Colorado Company had no right to use the name in any way that would be likely to confuse and deceive the purchasing public. Hygrade Food Products Corp. v. H. D. Lee Mercantile Co. (C. C. A. 10) 46 F. (2d) 771, 772.

Furthermore, the word MACY, being a part of the Macy Company's corporate name, not only identifies its merchandise, but the corporation itself. Persons having business relations with the Macy Company, upon learning of the "Macy Tailoring System of America," might well believe that the Macy Company had established a Denver branch and was engaged in selling a one-price, low-grade line of clothing, and the business practices of the Colorado Company might reflect upon the business and corporate reputation of the Macy Company. This is an additional reason why the Macy Company was entitled to relief. Standard Oil Co. of New Mex. v. Standard Oil Co. of Calif., supra.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.