## UNITED DRUG CO. v. PARODNEY.

District Court, E. D. New York. January 9, 1928.

1. **Trade-marks and trade-names and unfair competition ⊜⟹97—Equity court may restrain probable wrongful appropriation of property by use of similar trade-name.**

A court of equity need not wait for appropriation of one's property by use of similar trade-name to actually take place, such as court of law must do, if it plainly and clearly appears that such wrongful appropriation is extremely probable and plainly likely to take place.

2. **Trade-marks and trade-names and unfair competition ⊜⟹93(3)—Evidence showed plaintiff had obtained throughout trade secondary meaning for its name "United Drug."**

In suit to obtain decree forbidding defendant from using name "United Drug," evidence *held* to show that plaintiff had obtained throughout trade a secondary meaning for its name "United Drug."

3. **Trade-marks and trade-names and unfair competition ⊜⟹93(3)—Evidence showed defendant intentionally changed business name to one similar to plaintiff's, and was doing business in competition with plaintiff under such name.**

In suit for decree forbidding defendant to use name "United Drug," evidence *held* to show that defendant intentionally changed his business name to one substantially similar to plaintiff's and was doing business in substantial competition with plaintiff under such name, and

that consumers had in many instances been confused.

**4. Trade-marks and trade-names and unfair competition ☜73(1)—Plaintiff, conducting business under name "United Drug," held entitled to decree directing that defendant eliminate "United Drug" from trade-name, to prevent appropriation of value of plaintiff's name by confusion of customers.**

Plaintiff, which had for about 25 years conducted business under name "United Drug," so that name had acquired secondary meaning, *held* entitled to decree directing that defendant, who had changed his business name to one substantially similar to plaintiff's and was doing business in substantial competition with plaintiff, eliminate from his trade-name words "United Drug," in order to stop intentional confusion, or likelihood of confusion of customers of parties, and prevent defendant's appropriation of some of value of plaintiff's name, which was sole property of plaintiff.

**5. Trade-marks and trade-names and unfair competition ☜73(1)—Plaintiff, having become well known under trade-name, to defendant's knowledge, before defendant entered field, was entitled to protection.**

Plaintiff, being first in field and having become, to defendant's knowledge, well known in field under name "United Drug," before defendant entered field, was entitled to protection in use of trade-name.

**6. Courts ☜314—Unfair competition with Massachusetts corporation, doing interstate business, without certificate from New York, by New York corporation, could be passed on by court.**

Where Massachusetts corporation's business was purely interstate, unfair competition with it by New York corporation, where proper jurisdiction was obtained, could be passed on by United States District Court for Eastern District of New York, though plaintiff had not filed certificate in New York under its General Corporation Law (Consol Laws N. Y. c. 23), and was without certificate from state of New York.

**7. Trade-marks and trade-names and unfair competition ☜86—Suit for decree forbidding use of trade-name held not barred by laches, where plaintiff attempted since 1922 to settle matter without suit.**

Where plaintiff in 1922 first became aware of defendant's unfair competition by using similar trade-name in competition with plaintiff, and immediately called defendant's attention to matter, and correspondence between attorneys of parties finally culminated in lawsuit, there was no undue delay, and resulting damage to defendant because of neglect and delay, barring suit for decree forbidding defendant from using name "United Drug" on ground of laches.

In Equity. Suit by the United Drug Company against Abraham Parodney, doing business under the name and style of the United Drug Exchange. Decree for plaintiff.

Harry D. Nims, of New York City (Minturn De S. Verdi and Wallace H. Martin, both of New York City, of counsel), for plaintiff.

David D. Levinson, of New York City (Alexander S. Drescher and Harold J. Drescher, both of Brooklyn, N. Y., of counsel, and Solomon A. Hauptman, of Brooklyn, N. Y., on the brief), for defendant.

INCH, District Judge. Plaintiff brings suit to obtain a decree forbidding the defendant from using the name "United Drug." Defendant has duly answered. Jurisdiction is based upon the diversity of citizenship of the parties, and same has been duly proved.

The plaintiff is a Massachusetts corporation, resident in said state. The defendant is a resident of the state of New York. The complaint alleges unfair competition on the part of the defendant by his use of the said name "United Drug Exchange." No money damages are sought. The sole relief asked for is a permanent injunction, forbidding the use of said name by defendant.

The case was carefully tried by able trial counsel, and a considerable latitude was allowed by the court in regard to the introduction of evidence owing to the nature of the suit. Most excellent briefs have been submitted, and they have been of great assistance to the court. There is, however, no necessity for quoting in this opinion the many cases thus presented, for, once the essential facts in this case have been ascertained, the law applicable thereto is well settled. British-American Tobacco Co., Lim., v. British-American Cigar Stores Co., 211 F. 933, Ann. Cas. 1915B, 363 (C. C. A. 2d).

The facts briefly are that about 25 years ago plaintiff was organized as a New Jersey corporation under the name "United Drug Company." The reason for the selection of this name will be hereafter referred to. The business continued until a reorganization occurred, when as a part of such reorganization a New York corporation was formed, in 1916, also having the name of "United Drug Company." Shortly thereafter, in the same year, the present plaintiff, the Massachusetts corporation, having the same name, "United Drug Company," was there incorporated. Plaintiff has not filed a certificate in the office of the secretary of state, state of New York, under the General Corporation Law of the state. Laws 1927, c. 425, § 15; McKinney's Corp. Laws of New York, vol. 22.

It thus appears that this business has always been conducted, during a quarter of a century, under the name "United Drug Company"; that the business has had three residences, first New Jersey, then New York,

and finally Massachusetts. During all this time this business has gradually increased, until to-day, under the name "United Drug Company," plaintiff sells in every state and important city of the country. It also manufactures a considerable portion of its products. The remainder of its merchandise consists of well-known articles. Its method of merchandising is to and through many thousands of independent retail drug stores. These drug stores are not owned by the plaintiff, but are selected as leading drug stores in a community, and by such selection they become known as stores so expressly selected and approved of by plaintiff. This selection is made to the public by a sign showing that they are, for example, a "Rexall" or a "Liggett" store; these being chains of stores that occupy prominent places in the principal cities and towns and are operated by independent corporations.

Plaintiff likewise sells to any drug store anywhere in the country, or to the public directly, where its products are not accessible to such consumer by reason of there being no selected drug store in that community. According to the testimony, 70 per cent. of the merchandise manufactured by plaintiff bears the name "United Drug Company." The total amount of such product was recently $28,000,000. In addition there is a large amount of the merchandise not so manufactured by plaintiff, but sold and handled by it in the way above described, a large proportion of which is also marked "United Drug Company." This is for the purpose of indicating to the public plaintiff's approval of the product. The total amount of sales of this plaintiff recently amounted to approximately $90,000,000.

It appears beyond a doubt, from the proof, that plaintiff is one of the largest sellers of drug store merchandise in the world. Its merchandise must have been found worthy by the public, and the standard of quality of its products been recognized, for there has been an ever-increasing use and demand for same both by individuals and by drug stores. The reputation, therefore, of the plaintiff, does not rest upon some unusual, expensive and sudden advertising campaign. It is the result of years of steady growth, during all of which time the public has been taught to identify plaintiff's goods and its approval of goods manufactured by others, by the use of the name "United Drug Company."

During these years an immense amount of money has been spent for that purpose. Millions of circulars, advertisements, labels, etc., have been used. I find no difficulty in finding from the evidence that the name "United Drug" has become fixed in the minds of the consumer, whether such consumer be a retail druggist or the ultimate consumer, those who buy over the counter of a drug store. A secondary meaning of the name "United Drug" has resulted.

Throughout the United States the products and merchandise of the plaintiff are now referred to, ordered, or asked for by many drug stores and individual consumers as that of the "United Drug." This is an identification mark, widely used, which belongs to plaintiff, which plaintiff has created by expenditure of large sums of money, and honest and skillful management, and which it is entitled to keep unless voluntarily relinquished.

Theoretically and perhaps practically as well this hard-earned right is as important as money in the bank. It should not be taken, or even nibbled away, by another, any more than any of the dollars should be taken from its bank, against its protest and without right in law or equity to do so. The rightful appropriation or the wrongful appropriation by another of such substantial property belonging to plaintiff, in connection with the ultimate disposal of merchandise, is really the serious question involved in this suit.

[1] A court of equity need not wait for the appropriation to actually take place, such as a court of law must do, if it plainly and clearly appears that such wrongful appropriation is extremely probable and plainly likely to take place. A court of equity, so to speak, can "lock the stable door before the horse is stolen." Of course, it should only so interfere where a clear case is shown. Business should not be unduly interfered with because of extravagant claims or mere fears and suspicions. I mention this in consequence of the argument of defendant for a narrower view as to the court's right to interfere.

Finally, plaintiff's business is entirely interstate. Its orders are received and filled at Boston. In 1916, as a New York corporation, it had the corporate name given to it of "United Drug Company." The business within this state was transferred to the Massachusetts corporation and the New York corporation ceased to exist. However, this does not prevent the Massachusetts corporation from selling merchandise into the state of New York. The fact that plaintiff does a very large business throughout the United

States, under the name "United Drug Company" is undisputed.

Let us now consider the defendant. The defendant, Abraham Parodney, in 1904, was a registered pharmacist. He remained a druggist until 1912. He was thus entirely familiar with the drug trade. In 1912 he went from the retail drug store into the wholesale line, under the name of the "National Drug Supply Company." Then he sold out and went back into the retail drug store business. He, however, continued to do a little jobbing and to handle occasional items wholesale. While he was in the wholesale line he had met a Mr. Arronson. Mr. Arronson was also in the wholesale line under the name of the "Royal Drug Company." Parodney and Arronson thereafter decided to go into a partnership. It is apparent that both Arronson and the defendant, Parodney, were well equipped with knowledge of the entire trade in drug supplies. This was in 1914. The plaintiff's merchandise that year was on sale in several thousand retail drug stores. It was then an extensive advertiser in the leading periodicals. It was then publishing very large catalogues selling its goods all over the United States. The evidence shows that even two years before (1912) it was doing a business of over $5,000,000. It was in 1914 plainly one of the leading drug companies of the country and was a success.

I cannot assume, or even believe, that two such experienced men as defendant and Arronson did not know all about the plaintiff, the quality and demand for its goods, and its then standing in the trade in which they had been for 10 years. There is nothing to indicate to the contrary in the evidence. Thereupon Arronson and the defendant changed the name of their company, "Royal Drug Company" (it was not incorporated) to the "United Drug Exchange." Later Arronson ceased to be a partner, and the defendant continued and still continues to conduct the business by means of this trade-name, the certificate for which has been duly filed according to the laws of the state of New York. His principal place of business is in New York City.

The evidence shows that he manufactures a portion of his merchandise. The balance he wholesales, although there is testimony that what is considered by him to be wholesale is several or more articles. We likewise find that defendant extensively pushes his merchandise, distributing over 30,000 catalogues a year by mail to druggists all over the United States. He uses a large amount of catalogues, letterheads, billheads, etc., all marked "United Drug Exchange." I am perfectly satisfied from the proof that both the plaintiff and defendant are doing the same kind of business, are oftentimes reaching the same customers, and that both are equipped to enter each other's field completely. They have entered the same field on numerous occasions.

There is nothing in this case which prevents either the plaintiff or the defendant from selling to whom they please in such field, nor does the plaintiff complain of such kind of competition. All the plaintiff seeks is that, when defendant does so compete, he compete fairly, and not unfairly, under a name which has become considered plaintiff's name. In other words, defendant should not intentionally appropriate to himself this property of plaintiff's without its consent and against its protest.

The injunction sought, therefore, is not against the sale of drug supplies by defendant. There is no proof that defendant ever sold plaintiff's drugs as his own. However, if the testimony of these witnesses for plaintiff is true, and I believe it is, defendant has gained a considerable advantage in the trade by the subtle fact that he has created intentionally a widespread confusion as to the product of plaintiff and defendant. Orders have been received by defendant that were intended for plaintiff. Checks have been made to plaintiff and sent to defendant with such orders. Defendant has changed the payee of checks (plaintiff's) to that of his own trade-name and kept the money, for the reason that he thereby sold his own goods in this confusion.

It is unnecessary to detail this testimony. The fact that confusion is clearly present is sufficient. Nor is the injunction sought against the word "United." That is not the ground of complaint on the part of plaintiff. What is complained of is, not the nature of the business, nor the use of any single word, but is the appropriation unfairly by the defendant of the words "United Drug" in a line of business the same as that conducted by the plaintiff under the name "United Drug."

Defendant's counsel argues that the giving of this exclusive right to plaintiff would prevent any other concern from using the name "United," such, for example, the large United Cigar Store Company. In making this argument he misconceives the ground upon which the relief is asked for in this suit. Nothing here decided would prevent a cigar

company from innocently selling drugs and drug store supplies, nor any company from doing the same thing. If the United Cigar Company should change its name to United Drug Company for the specific purpose of selling drugs in competition with plaintiff, it not only could be stopped, but ought to be stopped. In my opinion, such company would itself agree that it should be stopped. [2] We find, therefore, that plaintiff has obtained, throughout the trade, a secondary meaning for its name "United Drug"; That this has been obtained through a long period of years, by the expenditure of large sums of money and reliable business methods, together with a standard quality of goods, which have met the approval of a great number of druggists throughout the entire United States, and necessarily of the "man in the street," upon whom the retail druggist depends for a living.

[3] We likewise find that the defendant intentionally changed his business name to one substantially similar to plaintiff's, and is doing a business in substantital competition with plaintiff under such name, although, apparently, in regard to some articles somewhat cheaper, and that both druggists and, what is more important, consumers have in many instances been confused. Gulden v. Chance (C. C. A.) 182 F. 303. It is equally clear by convincing proof that such confusion is more and more likely to arise as the defendant's business grows.

[4] This would seem sufficient for the court to interfere, not to prevent the defendant from doing business, but to stop this intentional confusion or likelihood of confusion, by directing that defendant eliminate from his trade-name the words "United Drug."

There are one or two other matters that should be mentioned.

First. It may be considered how plaintiff and defendant came to choose their respective names. Plaintiff's reason is entirely reasonable and plain. The plaintiff was called the "United Drug Company" because it was the result of a union of a number of druggists. The druggists united under a common leadership. What could be more natural than to call the result the United Drug Company?

The defendant, however, with his partner, Arronson, was going along pretty well, apparently, under the name of the Royal Drug Company but he says that, as war had been declared, evidently meaning, as this was in 1914, between Germany and England, they thought that it would be more patriotic in this country to abandon the word "Royal" and take the word "United." If this is so, it would have made the name of his company "United Drug Company."

Slight things often indicate the truth. However logical defendant's motive was, as to which there may be some unable to see such existing dissatisfaction with the word "Royal" at that time, yet it seems plain that for some reason defendant was unwilling to call his business "United Drug Company," which certainly was a good name for his purpose, but took off the "Company" and put in "Exchange." I am satisfied that this was done because the defendant well knew of the business of plaintiff.

Defendant further says that he used the word "Exchange" because at that time a large part of his business was "exchanging of drugs"; that is, he would exchange with a customer other merchandise for that in which the customer was overstocked. This was selling goods just the same, although a species of barter. The testimony on the trial shows that while this may be still a part of defendant's business, the catalogues, circulars, etc., urge straight sales. In my opinion, no such purpose could justify the use of "United Drug." The plaintiff does not complain of the word "Exchange."

[5] The next thing is that plaintiff was first in the field, and to defendant's knowledge had become well known in that field long before defendant entered it. Under such circumstances as here, the first comer who establishes should have some protection. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, page 415, 36 S. Ct. 357, 60 L. Ed. 713.

[6] Finally, the question of whether or not equity will aid the plaintiff in this case, because plaintiff is a foreign corporation, without certificate from the state of New York. The principle that I had in mind at the time that I raised this question at the trial was the principle that I seemed to recall in such cases as Mutual Export v. Mutual Export (D. C.) 241 F. 137, now cited by plaintiff in its brief. A careful study of this question now convinces me that such fact is no bar to this suit. Plaintiff's business is purely interstate, and unfair competition with it by any one, provided proper jurisdiction is obtained, can be passed upon by this court. It is not the concrete right to do business in a state that is in question, but the right of a corporation of any state, rightfully doing business, to be free from unfair competition on the part of any one in any state. There is no restriction on interstate commerce by the

New York State statutes, and Judge Hand expressly says at page 138 (Mutual Export v. Mutual Export, supra) : "Hence a foreign corporation can restrain the use by a domestic corporation of a trade name similar to its own when such name is chosen by the domestic corporation with notice of the name and business of the foreign corporation, even though the latter has obtained no authorization to do business in New York. This is well settled and the equity is based upon the prevention of fraud." Cases cited.

The facts also in that case were entirely different from the facts before me. See, also, Wing v. McCallum (D. C.) 16 F.(2d) 645. Nor is the defendant a corporation. He has simply selected a "trade-name."

[7] Defendant urges that, even though plaintiff be entitled to an injunction on the facts, it should not be granted because of "laches." All that need be said as to this is that, while equity favors the diligent, and may refuse to interfere where a party has unduly delayed, and resulting damages will arise to defendant because of such neglect and delay (France Milling v. Washburn-Crosby [C. C. A.] 7 F.[2d] 304, writ denied 268 U. S. 706, 45 S. Ct. 640, 69 L. Ed. 1168), no such facts appear in this case.

In 1922 plaintiff first became aware of defendant's unfair competition. Immediately the attention of defendant was called to the matter. The correspondence between defendant's attorneys and the attorneys for plaintiff finally culminated in this lawsuit. Surely plaintiff cannot be blamed for attempting to settle the matter amicably, nor has there been any undue delay, except a natural reluctance to engage in an expensive lawsuit to protect its rights, unless absolutely forced to do so. It was so forced, and the result of the trial satisfies me, after a more careful examination of the testimony, in addition to a careful observance of the witnesses on the stand, and due consideration of the excellent briefs and cases therein cited, that plaintiff should have a decree.

I am satisfied that defendant has taken the name "United Drug" deliberately and because of his knowledge of plaintiff's standing, and there is clear and convincing proof that unfair competition has thus been caused, and that defendant has appropriated and is plainly likely to appropriate some of the value of this name, which has a secondary meaning in the trade, and which is the sole property of the plaintiff.

Decree for plaintiff.